UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.  CASE NO.: 2:22-cr-67-SPC-KCD

MARVIN HARRIS, JR.
_____

**OPINION AND ORDER**[1]

Before the Court is Defendant Marvin Harris, Jr.'s Motion to Suppress (Doc. 78) and supplemental memorandum (Doc. 101), along with the Government's responses in opposition (Doc. 83; Doc. 107). The Court held two evidentiary hearings, both of which Harris attended with counsel. The Court reserved ruling at the end of the hearings but now issues this decision to explain why it denies the Motion.

## BACKGROUND

At the hearings, the Government called four witnesses from the Fort Myers Police Department ("FMPD"): Detective Malissa Langton, Lieutenant Rico Dorro, Officer Luke Walsh, and Officer Robin Vazquez.[2] It also introduced

---

[1] Disclaimer: Papers hyperlinked to CM/ECF may be subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or their services or products, nor does it have any agreements with them. The Court is not responsible for a hyperlink's functionality, and a failed hyperlink does not affect this Order.

[2] Dorro is now retired from the FMPD. And Officer Walsh left the FMPD in March 2022 to live and work in Tennessee. For purposes of this Motion, however, the Court refers to them as "Lieutenant Dorro" and "Officer Walsh" to reflect their positions during the time in question.

1

this evidence: two video recorded witness interviews, a home surveillance video, a traffic warning, maps, and pictures. Harris offered no witnesses or evidence. Based on the testimony, evidence, and record, the Court makes these findings of fact material to the Motion.

Harris has been charged with murder-for-hire. For purposes of the Motion, the timeline starts on November 2, 2019,[3] with the drive-by-shooting of K.U., and ends five days later with Harris committing a traffic violation. Between those dates, the police were actively investigating the murder. That's the short version, and here's the long one.

On November 2, Harris asked Susan Bohanon to borrow her car. She said no but mentioned that her friend, Stasia Bolitho, had a car. Bohanon then asked Bolitho if she could drive "Mesh"[4] to Naples for $100. Bolitho agreed, even though she'd never met Mesh. Bohanon gave Harris Bolitho's number so the two could coordinate.

Later that day, Harris texted Bolitho his location—731 Oleander Avenue. Bolitho arrived there around 4:53 p.m. Waiting there was Harris and his two associates with a new plan. Rather than go to Naples, Harris wanted his associates to take Bolitho's car, a grey Nissan Kicks. Although she

---

[3] Unless otherwise stated, all dates occurred in 2019 and all events occurred in Fort Myers, Florida.

[4] Mesh is undisputedly Harris' alias.

did not know why the plan had changed, Bolitho agreed. So Bolitho and the associates drove to a nearby bar where they left her and took the car.

About fifteen minutes later, K.U. was killed. A home surveillance video captured the shooting and was played at the hearing. (Doc. 109, Gov't Ex. 3). The video showed, around 5:12 p.m., K.U. standing in the street next to a parked car when an approaching gray Nissan Kicks slowed down. Someone inside the Kicks shot at K.U. and sped away.

Although Bolitho never again saw Harris' associates, she had contact with Harris twice more. The first was after the shooting when Harris returned the car to Bolitho. The second was the next day (November 3) when Bolitho texted Harris to ask if she left her purse at the Oleander address. He responded, "Nah hun but ima start delivering to u hun no point of u drivin to my house or I'll meet u." (Doc. 109, Gov't Ex. 4a at 1).

Then, three days after the shooting (November 5), Harris contacted Bohanon to offer her free drugs. She accepted and drove to meet Harris. While together, Harris asked Bohanon to delete their text messages. He also gave her a new number to contact him. Later that day, Bohanon texted Harris: "Hey I've deleted everything from my phone and my girl says that her purse and ID are missing WTF the police just surrounded her house about an hour ago I don't even want to know I'm going to try to get ahold of her in a little bit." (Doc. 109, Gov't Ex. 5 at 1). Harris responded, "I don't know what u talkin about see

3

you soon tho." (Doc. 109, Gov't Ex. 5 at 1). He also asked how she knew the police were at Bolitho's home and if they were still there. (Doc. 109, Gov't Ex. 5 at 1-2).

The next day (November 6), the FMPD located the Nissan Kicks and Detective Langton interviewed Bolitho and Bohanon. The interviews were recorded, and parts were played at the hearing. (Doc. 109, Gov't Exs. 1a-b & 2a-2c). Bolitho and Bohanon recounted the above facts about what happened before and after the murder to Detective Langton, largely corroborating each other.

Three other noteworthy things happened during the interviews. First, Bolitho and Bohanon each consented to Detective Langton reading their text messages with Harris. Second, Bohanon identified Harris in a six-person photo array. (Doc. 109, Gov't Ex. 6-7). Third, Bolitho revealed that her boyfriend found a spent gun casing in her windshield on the day after the shooting.

Finally, five days after the shooting (November 7), Detective Langton held a morning briefing with other FMPD officers about K.U.'s murder investigation. She explained why she believed Harris to be involved with the murder and that his cell phone should be seized if they encounter him. Lieutenant Dorro went to the briefing and passed Detective Langton's message to his unit, which included Officer Walsh.

Later that morning, Officer Walsh and his K9 partner were patrolling a high-crime area of Fort Myers in an unmarked truck when Ofc. Walsh spotted Harris driving his BMW. Officer Walsh followed Harris for several blocks, during which time he saw him speeding and rolling through a stop sign. Officer Walsh conducted a traffic stop. Officer Walsh approached Harris' car and asked for his driver's license, registration, and proof of insurance. Harris had none.

Officer Vazquez arrived on scene as backup within about four minutes of the stop. Officer Walsh immediately asked Officer Vazquez to take over the traffic stop and to write Harris a traffic warning for violating Florida Statute § 316.074(1).[5] While Officer Vazquez was looking up Harris' information and writing the warning, two things happened.

First, Officer Walsh had his K9 partner conduct a free drug air sniff of Harris' car. Before the sniff, however, Officer Walsh asked Harris to exit his car per FMPD policy. Harris complied and exited the car with his cell phone in hand. Moments later, the K9 officer circled the BMW twice and alerted. Officer Walsh then searched the car and found cocaine residue and marijuana.

---

[5] Section 316.074(1) says, "The driver of any vehicle shall obey the instructions of any official traffic control device applicable thereto, placed in accordance with the provisions of this chapter, unless otherwise directed by a police officer, subject to the exceptions granted the driver of an authorized emergency vehicle in this chapter."

Second, Officer Walsh called Lieutenant Dorro to say he stopped Harris. Lieutenant Dorro then called Detective Langton, who said to seize Harris' phone. Lieutenant Dorro relayed the instruction to Officer Walsh, who complied. Although Officer Walsh seized Harris' phone, FMPD did not search it until after they obtained a search warrant.

The encounter did not end with an arrest. Instead, Officer Walsh signed the traffic warning notice, gave it to Harris, and let him go. (Doc. 93, Gov't Ex. 2).

About three years later, a federal grand jury indicted Harris for conspiring to commit the murder-for-hire of K.U. and causing another to travel in interstate commerce to commit the murder. (Doc. 1).

## DISCUSSION

Harris has moved to suppress certain evidence for Fourth Amendment violations. He brings three arguments: (1) Officer Walsh had no reasonable suspicion to initiate the traffic stop; (2) Officer Walsh unlawfully prolonged the traffic stop; and (3) Officer Walsh had neither probable cause nor other grounds to justify the warrantless seizure of his cell phone. The Court will address each argument in turn.

**A. Reasonable Suspicion to Initiate the Traffic Stop**

Harris first argues the traffic stop was pretextual. He eludes that Officer Walsh pulled him over only because his superiors said to be on the lookout for

Harris and his cell phone. So he doubts that Officer Walsh saw him speeding and rolling through a stop sign, especially because Harris was never ticketed or arrested for those traffic offenses. The Court is not convinced.

The Fourth Amendment protects individuals against unreasonable searches and seizures. A traffic stop is a seizure under the Fourth Amendment. So an officer making a traffic stop must have reasonable suspicion, or "a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Campbell,* 26 F.4th 860, 880 & n.15 (11th Cir. 2022) (en banc) (noting that probable cause is sufficient to allow a traffic stop, but only reasonable suspicion is necessary).

Here, Officer Walsh had reasonable suspicion to conduct the traffic stop because it is undisputed that he saw Harris speeding and rolling through a stop sign in violation of Florida law. *See* Fla. Stat. § 316.074(1) (requiring driver's to "obey the instructions of any official traffic control device"); *see also United States v. Harris,* 526 F.3d 1334, 1338 (11th Cir. 2008) (holding that an officer had probable cause to stop a vehicle after observing that it did not signal a lane change). Officer Walsh testified to pacing Harris' car and estimating him driving 38 to 40 mph in a 25-mph speed zone. Officer Walsh also watched him roll through a stop sign. Harris offered no testimony or evidence to controvert or discredit Officer Walsh. *See United States v. Joseph,* 611 F. App'x 946, 947-48 (11th Cir. 2015) (finding no clear error with the district court

7

crediting officers' testimonies about the defendant not wearing a seatbelt when the defendant offered no contrary evidence). And the Court independently found Officer Walsh to be credible on the matter. Officer Walsh was an experienced officer at the time of the stop. During his testimony, he detailed how he knew Harris was speeding, his vantage point for the traffic violations, and his familiarity with the traffic requirements on the streets around where the stop occurred. Officer Walsh's demeanor while testifying was calm yet confident in his memory of the relevant events. And that's consistent with the fact that Officer Walsh is now removed from Harris and this case because he lives and works in another state.

Harris tries to distract from Officer Walsh's otherwise credible testimony by broadly arguing the stop was pretextual. As best the Court can tell, Harris argues Officer Walsh stopped him—not because of so-called traffic violations—but because Detective Langton ordered supporting units to stop Harris and seize his cell phone just hours earlier. But the Supreme Court long ago rejected Harris' pretext argument.

In *Whren v. United States*, the Supreme Court held that an officer's subjective motivations are immaterial to whether a traffic stop is reasonable under the Fourth Amendment if he had probable cause. 517 U.S. 806, 813 (1996) (rejecting "any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individuals officers

8

involved"); *see also United States v. Holloman,* 113 F.3d 192, 194 (11th Cir. 1997) ("[*Whren*] conclusively refutes the notion that ulterior motives may invalidate police conduct that is justified on the basis of probable cause to believe that a violation of law has occurred."). When objectively viewing the circumstances here, the stop was justified regardless of Officer Walsh's alleged ulterior motives. *See Holloman,* 113 F.3d at 194 ("As it is undisputed that the police officers in the present case possessed probable cause to believe that a traffic violation had occurred, their seizure of [defendant] and his vehicle comports with the Fourth Amendment notwithstanding their subjective desire to intercept any narcotics being transported into Pinellas County.").

Because there was probable cause that Harris committed traffic infractions, the Court will next address whether Officer Walsh unlawfully prolonged the stop.

**B. Prolongment of Traffic Stop**

Even if the police make a constitutional traffic stop, they do not have unfettered authority to detain a person indefinitely. Because any detention must be limited in scope and duration, officers must investigate diligently and cannot unlawfully prolong a stop. *See Rodriguez v. United States*, 575 U.S. 348, 354-57 (2015).

"[A] stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop to

9

investigate other crimes." *Campbell*, 26 F.4th at 884. Broken down, a stop is unlawfully prolonged if the officer "(1) conduct[s] an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion." *Id.* Conversely, an officer doesn't unlawfully prolong a stop when he makes related inquiries to address the traffic violation or officer safety. And these inquires can include investigating a driver's license, car registration, and outstanding warrants. *Id.* at 882. But using a dog to search for contraband is unrelated. *See Rodriguez*, 575 U.S. at 355-56. Still, "[u]nrelated inquiries are permitted so long as they do not add time to the stop." *Campbell*, 26 F.th at 882 (citation omitted).

Harris argues Officer Walsh unlawfully prolonged the stop with the dog sniff. Not so. The K9 officer was with Officer Walsh when he initiated the traffic stop. And the dog sniff happened while Officer Vazquez was checking on Harris' license, inspected his car's registration, proof of insurance, and outstanding warrants, and wrote the traffic warning (which took longer because Harris had no documents). The dog sniff also took seconds to complete and finished long before the traffic citation was finished. Also, the moment the K9 officer alerted to the presence of drugs in Harris' car, the traffic stop converted into a drug investigation. So the dog sniff did not add time to the traffic stop.

10

What's more, Officer Walsh had reasonable suspicion to use the K9. When Officer Walsh stopped Harris, they were in a known high-crime area of Fort Myers and Harris was a known drug dealer. Harris also seemed nervous, sweaty, shaky, and avoided eye contact when Officer Walsh first approached his car. And the stop occurred right near one of Harris' trap houses just off Oleander.

At bottom, Harris does not say how Officer Walsh unlawfully prolonged the traffic stop. He simply relies on broad assertions that Officer Walsh and Officer Vazquez were not credible and that he was stopped and detained for pretextual reasons. But the Court has already rejected the pretextual argument.

In sum, the Court finds that the stop was not unduly prolonged.

### C. Warrantless Seizure of Harris' Cell Phone

Lastly, Harris argues the seizure of his cell phone violated the Fourth Amendment. It's undisputed that Officer Walsh took Harris' cell phone at Detective Langton's direction and without a warrant. So the question is whether Detective Langton had probable cause to seize the phone, and if so, whether there was some justification to do so without a warrant.

To start, probable cause "is not a high bar." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018). Although probable cause requires more than suspicion that criminal behavior is afoot, it does not entail the same

11

"standard of conclusiveness and probability as the facts necessary to support a conviction." *United States v. Dunn*, 345 F.3d 1285, 1290 (11th Cir. 2003). Probable cause needs only "a substantial chance" that evidence of criminal activity exists. *See Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983). And a "substantial chance" occurs "where the facts within the collective knowledge of law enforcement officials" are enough "to cause a person of reasonable caution to believe that a criminal offense has been or is being committed" and that evidence of the offense will be found in a particular place. *Gates v. Khokhar*, 884 F.3d 1290, 1298 (11th Cir. 2018).

The Court has little trouble concluding that Detective Langton had probable cause to believe evidence related to K.U.'s murder was on Harris' phone.[6] As of at least November 6, Detective Langton knew a gray Nissan Kicks was the car the perpetrators used during the shooting. That information led to finding the Kicks' owner—Bolitho. From there, Detective Langton interviewed Bolitho about why her car was part of the drive-by-shooting. And she interviewed Bohanon about connecting Bolitho and Harris

---

[6] The Government argues that Detective Langton's probable cause is shared with or imputed to Officer Walsh. Harris does not dispute this point, and the case law supports it. *See, e.g.*, *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) ("Probable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed . . . A reviewing court may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation." (internal citation omitted)).

on the day of the shooting for car arrangements. Information Detective Langton gathered from them included:

- Bolitho coordinating with Harris via text for a ride in her Kicks in the hour or so before the murder

- Harris' switching the plan last-minute to his associates taking Bolitho's Kicks alone for reasons not given to her

- Harris' associates dropping Bolitho off at a local bar about 5 minutes from where the murder took place and taking her car

- Harris meeting with Bolitho to return her car shortly after the murder took place

- Harris, on the day after the murder, texting Bolitho that she didn't need to return to his Oleander address for her purse, which suggested he was distancing himself from her

- Bolitho's boyfriend finding a spent shell casing in the Kicks' windshield on the day after the shooting, which police later recovered

- Harris asking Bohanon to delete their text messages after the shooting and giving her a new cell phone number to use for him

- Bohanon texting Harris that she deleted the messages and that she just saw police at Bolitho's home

- Harris asking Bohanon how she knew the police were at Bolitho's home and whether they were still there

The above facts considered together create probable cause to believe that Harris was involved in K.U.'s murder. And it was no leap for the FMPD to deduce that evidence of K.U.'s murder would likely be found on Harris' phone. Detective Langton read text messages between Harris and Bohanon discussing the police being at Bolitho's home and Bohanon confirming she deleted their

13

text messages. She also read messages between Bolitho and Harris like him telling her not to return to the Oleander address. So it was reasonable for Detective Langton to believe that more evidence would likely be on Harris' phone. But only if the police acted quickly. And, as explained below, the need to act fast further justified seizing Harris' phone without a warrant.

Exigent circumstances is an accepted exception to the warrant requirement. It lets officers conduct a warrantless seizure "when probable cause has been established to believe that evidence will be removed or destroyed before a warrant can be obtained." *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990); *see also United States v. Mikell,* 102 F.3d 470, 475 (11th Cir. 1996) ("Exigent circumstances arise when authorities have reason to believe that evidence is in danger of being destroyed or removed."); *cf. Kentucky v. King,* 563 U.S. 452, 462 (2011) ("The exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense. Where, as here, the police did not create the exigency by engaging . . . in conduct that violates the Fourth Amendment, warrantless entry to prevent the destruction of evidence is reasonable and thus allowed."). Officers relying on the exception must show an "objectively reasonable basis" for deciding that imminent action was needed. *Young,* 909 F.2d at 446. The test thus hinges on whether the facts would have led "a reasonable, experienced agent to believe that evidence might

14

be destroyed before a warrant could be secured." *Id.* And the facts here show just that.

Without seizing the phone at the traffic stop, the FMPD had reason to believe that Harris may try to remove evidence on his phone related to K.U.'s murder. Afterall, he already had Bohanon delete text messages. So a reasonable, seasoned officer could believe more relevant evidence was in danger by Harris either erasing information himself or contacting others to trash anything connecting him to K.U.'s death. *See, e.g., United States v. Martinez*, 191 F. App'x 856, 859 (11th Cir. 2006) (finding exigent circumstances because "[t]he agents had reason to believe that the evidence was in danger of being destroyed because after [defendant] realized the drug deal had failed he could have used his cell phone to call his residence and order the drugs destroyed").

Yet Harris would have the Court find otherwise. He argues the Fourth Amendment does not let police conduct a traffic stop on a person-of-interest merely to seize a phone that could hold evidence of a crime. Often, the Court would agree with Harris. *See, e.g., Crocker v. Beatty*, 886 F.3d 1132, 1136 (11th Cir. 2018) (rejecting an exigent circumstances argument that would let police seize cell phones from any person, in any place, at any time, so long as the phone has photographs and videos that could serve as evidence of crime simply

15

because the device might get lost). But the facts here are narrower and do not support Harris' sweeping argument.

Detective Langton had recently learned that Harris solicited Bohanon to delete their text messages (and gave her free drugs for doing so). Detective Langton also learned that Harris knew of police being at Bolitho's home just days after the shooting. So it was objectively reasonable for the FMPD to fear Harris would continue down the path of destroying relevant evidence to distance himself from Bohanon, Bolitho, her Kicks, and K.U.'s murder. *See United States v. Oates*, 619 F. App'x 955, 959 (11th Cir. 2015) (affirming a warrantless seizure of a computer inside a home because someone there could have erased child pornography evidence on the device simply by shutting it down). The Court thus finds exigent circumstances to justify the warrantless seizure of Harris' phone.

In conclusion, the Court denies Harris' Motion because (1) the traffic stop was lawful and not prolonged, and (2) there was probable cause to believe Harris' phone had evidence related to K.U.'s murder and exigent circumstances justified its warrantless seizure.

Accordingly, it is

**ORDERED:**

Defendant Marvin Harris, Jr.'s Motion to Suppress (Doc. 78) and supplemental memorandum (Doc. 101) are **DENIED**.

**DONE and ORDERED** in Fort Myers, Florida on April 21, 2023.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies:  Counsel of record